I'm sure I mispronounced your client's name, so please correct me. I was happy to hear that you pronounced my name correctly. May it please the Court, my name is Chris Petard and I represent the appellant Charles Ikekwere in this matter. Mr. Ikekwere was a revenue agent with the IRS from June 22, 2009 until his termination January 11, 2011. He had filed claims of discrimination while employed there based on race, black, his national origin, Nigerian, and his disability. He suffered from depression and panic disorders. One of the issues in the case is the filing of his EEO complaints. Federal sector employees have a very short window in which they can file their claims of discrimination. Under 29 CFR 1614 part 105, they have 45 days to file a claim of discrimination from the time that they would have reasonably discovered that the discriminatory acts occurred. This is extremely short compared to state law or even federal law for private sector employees where they have 180 days or up to 300 days in which to file such a complaint with the EEOC. So as a result, a lot of times certain claims of discrimination may not necessarily be included because they were untimely or outside of the time frame in which the federal employee filed their EEO complaint. However, one exception to that is when you claim hostile work environment. And under National Railroad Passenger v. Morgan, the Supreme Court held that as long as one incident was within the statutory limitations, then you could bring other incidents of hostile work environment or harassment in as a part of the claim as long as one incident was within those limitations. For federal sector employees, it's even more important because of the short time frame in which they have to file their claims. In this situation, Mr. Equiquere filed his first EEO complaint with the EEO counselor on June 28, 2010. On that date is the date that his supervisor, Mr. Kenneth Shaw, told him to either resign or he'd be terminated and turn in all his credentials. A month before that, on May 31, 2010, Mr. Shaw had threatened Mr. Equiquere with termination, told him that because of his performance or other issues that he was going to terminate or he was thinking about terminating him. In April of 2010, are you talking about the notice when he was able to file his formal complaint? He has testified. Well, as you may be aware, Your Honor, or may not, there are two different stages to that. There is the informal complaint stage, which is what initiates the complaint, and that's what he filed on June 28, 2010. Where did he receive the notice? He received the notice on December 21, 2010, and signed for it on the 22nd of December, 2010, and then sent the application or the form to the EEO counselor on the 27th of December, 2010, and it was received on the 29th of December, 2010. Now, the form itself has a date of November 30, 2010, but Mr. Equiquere filled out the form. He testified that he received it on the 21st of December, and there's no evidence to the contrary as to when he received it because 1614 Part 106 says it's not the date of the notice. It's when it was received at the 15-day time frame it begins to run. So he says he received it on the 21st, he signed for it on the 22nd as having received it, and then sent it out on the 27th. So that issue, I believe, is one that's moot as far as the timeliness of his filing of his formal complaint. Part of the issue before that, though, was whether or not his earlier complaints of harassment could come in as part of his claim when he filed in June, on June 28, 2010. Our assertion is that May 31, 2010, was an incident of harassment when his boss told him that he was going to terminate him without actually giving him notice or doing anything else beyond that. Prior to that, in April of 2010, his supervisor, the same Mr. Shaw, had made comments about his accent, about his ability to communicate with other persons, taxpayers, and so forth. And then earlier than that, in September of 2009, when Mr. Equiquere received his commission to begin his work as a revenue agent, Mr. Shaw made similar comments about his ability to communicate, told him not to harass taxpayers, and would he be able to talk to judges, lawyers, and accountants, and so forth. So those were all brought in as a part of Mr. Equiquere's claims of hostile work environment. And that was an issue that was raised by the judge as to whether or not those claims could actually be acted on as part of his hostile work environment claim. And our assertion is that they can be because of the Supreme Court case that governs that. Now there are four issues of discrimination that Mr. Equiquere brought as a part of his complaint against the Department of Treasury. The first is discrimination based on race, black, and his national origin, Nigerian, when it came to the failure to promote him in October of 2010, as well as his eventual termination in January of 2011. The second claim that he brought was one of hostile work environment based on race and national origin. And his claim is that the harassment began as early as September of 2009 and did not end until he was actually terminated. His third claim of discrimination was retaliation, that he had engaged in protected activity as early as July 2009 when he first requested a reasonable accommodation. As the court is keenly aware, there are two types of protected activity, one where you participate in the employment discrimination process, another one when you oppose employment discrimination. Reasonable accommodation requests fall into the first category of participation when you are supposed to engage in the interactive process in order to hopefully get a reasonable accommodation once you have established that you are a qualified individual with a disability. Well, they provided accommodations for him. They did, but that was not until September of 2010. And the management officials, both Mr. Michael Simmons and Mr. Kenneth Shaw, both, first they said that they did not or were not aware that he had requested a reasonable accommodation as early as 2009, when in fact there is a letter or email in the record that shows where Mr. Simmons had directed Mr. Equiquere to the site where he could fill out the forms and so forth to request a reasonable accommodation. And then later on in December of 2009, Mr. Shaw does admit in his testimony that he saw a letter from Mr. Equiquere's physician that requested certain accommodations, including using headphones, a more secluded space to work, as well as additional time to complete tasks. And that was provided, but his performance still didn't improve. He still had very, very bad performance records. He was applying the tax code incorrectly. Well, that is certainly their assertion that he was applying the tax code incorrectly. He was getting what are called Ms, or meets standards, all the way up until about February 2010. And then after he had requested his accommodations and made it known that he was requesting them, that's when it appeared that his performance rating started to drop to Fs. And that's part of his contention is that it was not until after he had requested a reasonable accommodation that he began receiving the Fs on his appraisals as a part of a retaliatory effort by his boss to get him fired. And it was following that that we see the comments in April of 2010 and then the threats of termination in both May of 2010 as well as June of 2010. And I'm not saying that there weren't some performance issues with Mr. Equiquere. Part of his claim is that there was a white coworker who had similar types of performance issues, certainly up through the October 2010 timeframe, when they were both appraised at having or needing maximum supervisory levels. But Mr. Cowden, Jason Cowden, the white coworker, was promoted to GS-11, whereas Mr. Equiquere was not. And that was part of his claim is that he had another person who went through the training class with him who was not Nigerian, who was not black, who did not suffer from a disability, who had similar types of issues but was promoted regardless. What does that mean, similar types of issues? Performance issues. Was he getting Fs? Well, he had received some Ms. I'm talking about Cowden now. Had received Ms. Had received, I guess, a smattering of Fs. But he was judged as having or needing maximum supervisor levels. In other words, he needed maximum supervisory levels in order to do his job as opposed to the third person that went through the training class, Mr. Allen, who did not require that. Mr. Cowden did. And that was a result of some performance issues that he was experiencing along the way as well. After he got the supervisory help, did his performance records increase, improve? For Mr. Cowden, yes. Okay. And then finally, the last issue that Mr. Equiquere raises is one of disability discrimination. And that primarily has to do with his termination as well. Counselor, let me ask you, when was this complaint filed, first filed in the United States District Court in the Western District? Specific date. Well, just the years. I've got nothing. My question is, we're talking about events that happened eight years ago. I'm just curious as to where this case was filed. How long was it in the District Court? Oh, it was in the District Court probably maybe a year and a half at the most. And I'll tell you why it took so long to get to the District Court. It was because we exercised the administrative remedy of an appeal through the Office of Federal Operations at the EEOC first, to allow it to go through the administrative processes. And unfortunately, the OFO takes forever to return opinions back on these kinds of cases. If they're not procedural cases that deal with maybe the timeliness of a discrimination claim itself, they take forever when dealing with an administrative judge's decision. And I think it took almost two and a half years to get it back from OFO before we were able to file it in Federal District Court. So that's one of the reasons why it took so long to get to District Court. It wasn't in District Court maybe more than a year and a half. So I think we filed it maybe in 2014, but I would have to go back and look at that specifically. I just didn't know where it was residing. That court is reasonably current. That court in the Western District is reasonably current. That's why I was trying to account for that long time delay. Another reason why I think that it took a little longer in District Court is because it went through three judges. The first judge was the godfather of opposing counsel's child, so he recused himself. The second judge, Judge Yackel in Austin, for whatever reason, transferred to Judge Ezra at some point, and then eventually it was Judge Ezra who eventually made the decision to. . . Judge Ezra is a senior judge in Hawaii. Yes, he is. But he was the one who made the decision to grant the motion for summary judgment. In the last few seconds that I have before my time runs out, let me just say this before I leave. From our perspective, the bottom line is that Mr. Kenneth Shaw in particular did not want a Nigerian suffering from depression and panic disorder working for him, did everything in his power to create a hostile work environment and to terminate Mr. Quickware. It showed in his animus toward Mr. Quickware's disability as well as his national origin. And even though Mr. Quickware was transferred to another group, the damage had been done. And now, after he filed his EEO complaints, he was labeled a troublemaker, complaining of co-worker harassment, and the agency decided to terminate him. Thank you. Mr. Petard, you've saved time for rebuttal. Mr. Kupfer? May it please the Court. I'm Charlie Cooper. I represent Appellee, the Department of the Treasury. I'd like to start off this morning by responding to a couple of the claims, both legal and factual, made in the presentation we just heard. First of all, in the record before the Court, there is no evidence that Mr. Cowden had a smattering of Fs. There's just no record of that. Mr. Cowden, there's been an issue made that Mr. Cowden needed maximum supervision on one particular training component, and I believe that training component was the corporate taxation. And so as the revenue agents go through their first couple of years, they're getting trained in several different areas of taxation, one of them corporate, one of them business taxation. And prior to the issue with Mr. Cowden that the appellant has brought forward is that Mr. Cowden received basically a raise, a promotion or a raise, however you want to look at it. He was doing the same job but making more money, but in government we might call it a promotion, we might call it a raise. Prior to receiving that in the summer of 2010, Mr. Cowden was rated as needing the average level of supervision on, I believe it was his business taxation area. Not until October of 2010 was Mr. Cowden rated as needing maximal supervision on the corporate tax area. Well, the decision about both Mr. Cowden's raise or promotion and about Mr. — I'm so sorry that I'll butcher this, even though Mr. Bitar just said it, but Mr. Ekekwere, I believe, on his — the decision was made on his promotion or raise not to give him one, and Mr. Cowden did get one. That happened before October 2010. So certainly even if the need for maximal supervision indicates that Mr. Cowden was anywhere in the same range of performance as Mr. Ekekwere, it happened after that decision. Now the other thing, I've been calling it a decision and perhaps that's a little bit misleading. There really wasn't a decision to give anyone a raise or promotion or hold anyone back from a raise or promotion. The raise or promotion happened based on the performance, the performance evaluation from June of 2010. At that time, Mr. Ekekwere was rated as unacceptable and Mr. Cowden was rated as at least fully acceptable. So that's the reason for the promotion or raise. It happened at least for Mr. Ekekwere. He was automatically ineligible for that. There was no decision to give him one or not give him one. I also want to talk about some of the suggestion that Mr. Ekekwere engaged in protected activity by requesting a reasonable accommodation before June of 2010. Mr. Ekekwere says that he told people that, and it's only from his testimony at his deposition and from some e-mails that we see that he is claiming he told people in the summer of 2009, just after he was hired, that he had suffered depression, that he had a panic disorder. It's not clear from that record that he was telling them, I have this now and I need a reasonable accommodation for it. What is clear is that he actually filed finally or submitted a request for reasonable accommodation in June of 2010. In fact, it was June 29th of 2010. And I don't think the timing of that is coincidental. June 29th, 2010 was the day after his manager told him, you have a week to resign or you're going to be fired. And so he, the very next day, submits this request for reasonable accommodation. He dates that request for reasonable accommodation of December in 2009. Six months earlier? Yes. He dated it six months earlier and said, well, and I believe he told the EEO this as well. Here's my request for reasonable accommodation from six months ago. It never got processed. Well, funny thing about that request form, it was revised. It's a government form. It was revised in April of 2010. So it's hard to see how a jury, any reasonable jury, could reach the conclusion that it was ever acted on or even filled out in December of 2009. I don't believe Mr. Ekekwer would have had a five-month advance notice of an April 2010 revision. Would there be grounds for terminating an employee if they file a fraudulent report requesting accommodations? Your Honor, from a common sense perspective, I believe it would. But given that we're dealing with the government and these decisions are regulatory in large part, Your Honor, I take that back. In this case, Mr. Ekekwer was a probationary employee, and he could be fired for any reason. So certainly dishonesty would be one of them. I also have to say I certainly hope and believe that even a nonprobationary employee could be fired for dishonesty. However, I think that a nonprobationary employee, there would be some due process involved. For Mr. Ekekwer, there doesn't need to be. But what happened — Isn't falsifying a government document, isn't that a criminal offense? Your Honor, it is a criminal offense. I'm sorry, I don't know enough about the criminal statute for that to know whether or not criminal liability attaches to predating a document that way. But it certainly — my understanding is every week as a government employee, I fill out a form to tell the government I worked 40 hours. And if I only worked 39, it's a criminal offense. But I don't know about the date issue, whether there's a materiality standard, et cetera. I'm sorry, I just don't know. So — but what happened was the decision had been made in June 2010, after a year, that Mr. Ekekwer wasn't performing up to the standards of the IRS. And I just want to note for the Court that for the year and a half that Mr. Ekekwer was working at the IRS, his managers made consistent and detailed written criticism of his work. Now, the point of this written criticism was to help Mr. Ekekwer learn. But nonetheless, it serves as excellent evidence in this case that Mr. Ekekwer had significant performance problems. And by the way, those performance problems were in the same consistent areas and given the same consistent low ratings by not just his first manager, Mr. Ken Shaw, but by a second manager. And there's almost 200 pages of this record of poor performance in the record. And those span from record page 379 through 577. So there just isn't any contention that Mr. — or there's no reasonable contention here that Mr. Ekekwer was performing well or satisfactory or even at a minimum level. Mr. Ekekwer's performance was failing throughout his entire time at the IRS, and it was unacceptable. He was always rated in the ultimate evaluation as unacceptable. No, he wasn't qualified for the position. No, Your Honor. He was not qualified for his position. Now, in June of 2010, he — his manager tells him, this job is not working out for you, and we're going to let you resign. You have a week to make your decision. You can resign or you'll be terminated. That's June 28th of 2010. Mr. Ekekwer goes to the EEO, and based on — in the EEO record, in the counseling report, the EEO counselor notes that the decision to terminate him was suspended because he had asked for a reasonable accommodation, but it hadn't been given to him. There's no record of that prior submission of a reasonable accommodation request. And so it looks like Mr. Ekekwer went to the EEO office just after being told he was going to resign with a EEO request form dated December 2009, which now is seven months, six or seven months prior, saying, well, they've told me they're going to fire me, but no one ever worked on this reasonable accommodation. So the EEO officer or the EEO counselor contacted his chain of command, and they haven't seen this reasonable accommodation request. No one's looked down in the fine print that says the revision date. But — and the woman they contacted, Rosemary Flack, wasn't part of the conversation with Mr. Ekekwer about his termination anyway. She was up the chain. And the EEO counselor explains he asked for reasonable accommodation, and no one's responded, and now he's being fired. And they said, whoa, hold on, we're going to suspend the termination. Let's try and work with them. That's what they did. And here are the ways that — this is what I think gets the Department of Treasury summary judgment on this case, is that at this point the record becomes replete with evidence of nondiscrimination, evidence that the IRS, the Department of Treasury, attempted to work with this employee so that he would have an opportunity to succeed. So, first of all, they suspend the initial decision to terminate him, same day, June 28th. Second, they give him six more months to prove himself. Now, during that time, they transferred him to a new manager. That way we can make sure that this isn't an issue between two people who just are never going to click. And maybe it's personality, the way they get along, but also they are trying to train Mr. E-Kickwear, and it's clear that Ken Shaw has not been successful at that. What's not clear is, is that a coach problem? Is that a Ken Shaw problem? Or is that a Mr. E-Kickwear problem? So let's get him to a new manager. They send him to a new manager. At the same time, now, they got his request for reasonable accommodation on the 29th. They saw that he asked for a quieter space and also a quieter space on the same floor, less foot traffic. Also, headphones, a noise-canceling headset so that he could concentrate. They comply with that request. There was no negotiation. They just said, those two things we can do, and they did it for him. So they get those things done at the end of September 2009. So there's a little bit of a gap there, but here's why. Mr. E-Kickwear was presenting a doctor's note from long before he even started his work at the IRS in support of his request for reasonable accommodation, and they said, can you please get a more current doctor's note because that one says your prognosis is good and it's from several years ago, so we want to make sure we're treating whatever your current situation is. He gets a new doctor's note. They give him the reasonable accommodation, and he has a reasonable accommodation in September of 2009 that he asked for. He has a new manager in September 2009. In November, I'm sorry, I said 2009, and it was 2010 for both of those. Excuse me. In November of 2010, his new manager sends him an email. Is everything okay with your reasonable accommodation? He writes back, it's working great. Well, that's his own subjective perception, and maybe it was addressing whatever problems he was perceiving or feeling for his concentration, but his work product had not improved over that time, and he was given, again, poor performance evaluations during that period. Now, I also want to address, and I forgot to do this, I want to address that he never received fails ratings before any of his protected activity, and that isn't true. He received a fails rating in November 2009 on part of one of his cases, and in that fails rating, his manager said, I'm giving you a fails rating. I'm basically growing concerned about this area, and by the way, it was his communication. It was his written communication. I'm growing concerned about this because we've talked about it before, and it's a really important part of this job. So his manager tells him in November 2009 that there's this really important part of his job that he's failing at. November 2009 is only four or five months after he started there in June, and it's only a few months after he's just done with his training, his on-the-job training. And so, and by the way, that, Mr. Ekekwer presented that evidence in support of his response to our motion for summary judgment, and it's at record page 2043. So the claim that Mr. Ekekwer never received any bad feedback, that all his work was rated as just great, until he starts asking for a reasonable accommodation, until he makes these EEO claims, that is demonstrably false, and it's demonstrably false with evidence presented by Mr. Ekekwer. So to go back to how the IRS was trying to help Mr. Ekekwer, in January of 2011, his manager and his second-line manager have a meeting with him to tell him, you have not mastered the material that you need to have mastered for this first year. That was foundational material. And we're not going to advance you to the next class because you haven't mastered that. We need you to spend more time mastering that. He wasn't being proposed for termination or anything. It was just, we need to help you focus on this now. And, I mean, it's equivalent to taking, you know, the first-level calculus, and then you take the second-level calculus. If you get thrown into the second-level calculus and you haven't done well on the first-level calculus, it's not going to look good. And so he, at this meeting, has a blow-up. He begins crying and he yells at them. He yells so loudly that the occupant of the office next door is knocking on the walls and coming around to make sure everybody's okay. So a week later, another meeting is scheduled. At this meeting, Mr. Ekekwer is given a termination letter. The termination was because of his poor performance throughout the entire time that he was there at the IRS and also because of his inappropriate behavior at that meeting. I want to move on then to Mr. Ekekwer's discrimination claims. He's taken a shotgun approach at these claims, and he's made claims for failure to promote and discriminatory discharge under Title VII for race and national origin discrimination. But he wasn't qualified for his job and he wasn't qualified for his promotion. There's no evidence in the record to show that he was qualified for those things, and the Department of Treasury did provide evidence that he wasn't, almost 200 pages of evidence. He's made a claim for a hostile work environment. The hostile work environment claim is based on four things that happened. Most of them were before that 45-day period. Now, we heard some legal argument that you can extend back, and that's true, but you only get to extend back when the same sorts of incidents that you're complaining about within the 45-day period, when they're somehow actually related to the previous incidents. And there's none of that. The same people aren't involved and the same behavior isn't involved. Additionally, the district court reached the correct conclusion that the issues Mr. Ecoquere was complaining of were more akin to the simple, teasing, offhand comments and isolated incidents that don't amount to discriminatory changes in the terms and conditions of his employment. Mr. Ecoquere also made two disability discrimination claims, one for failure to accommodate and one for discriminatory discharge. However, he's not a qualified person. He wasn't able to do his job either with the reasonable accommodation, and he certainly wasn't able to do it before he had the reasonable accommodation. He says, well, I closed seven cases after I got the reasonable accommodation. And it's true that he closed seven cases after that. However, his job isn't any more about closing cases than mine is. My office is not going to be satisfied to know that, hey, a bunch of cases got resolved, but I made a bunch of mistakes in them. They were resolved against us, that sort of thing. It matters how he's doing it. It also matters that he has a good written record of what he's done because some of this stuff is going to end up being litigated. You can imagine some people don't feel good about the audit that they received from the IRS. Finally, he has complained about retaliation for his protected activity under both Title VII and the Rehabilitation Act for his nonpromotion and his discharge. However, he's got absolutely no causal connection. There is a temporal proximity, but in the face of the IRS's nondiscriminatory explanation that he was failing at his job, he has to have substantial evidence of pretext, and there just isn't any. For those reasons, Your Honors, I ask that the Court affirm the motion or, excuse me, affirm the order granting summary judgment in this case. Thank you. Thank you, Mr. Cook. All right. What is your answer to the issue that was raised about a document being supposedly backdated by six months under an old form that had been revised three months earlier? We don't have an answer for that. I know what Mr. Quickware stated, that he filled it out in December of 2009 with the support of two letters from his physicians, and the other issue as far as it being a form from April 2010 came up much later, so I have no explanation for that. All right. You can move on. Mr. Quickware states that English is his second language, and we understand that, that there may be some issues with his writing to that extent and his communication, but he is able to make himself understood. He is able to write in English. So although at times he was criticized for his communication skills and for his writing skills, that did not mean that he was not able to do or perform his job. A couple of things. One is that going from GS-9 to GS-11 is not just a raise, it is a promotion, and although it may be based on how well you do with your appraisals, it's still a decision that's made by people. It's not an automatic promotion. In the record it shows where various management officials were aware of his request for reasonable accommodations as early as July of 2009. When he was directed to the website, that email is found at page 877 in the record, and where Mr. Shaw, his supervisor, was in the meeting where he was directed to the website, and that Mr. Shaw admits that he saw the physician's letter requesting a reasonable accommodation, and that's found at 841 within the record. So when they said that they weren't aware that he was requesting reasonable accommodations earlier than June 29, 2010, I think those statements are false. Mr. Shaw also stated that Mr. Equiquere's condition, his depression and panic disorder, made him wholly unqualified for the job as a revenue agent, and that's found at page 840. That shows an animus toward Mr. Equiquere and the fact that he had or suffered from certain types of disabilities or impairments. And I understand that the agency transferred Mr. Equiquere from Mr. Shaw's group to Ms. Doyle's group, and that his performance didn't seem to improve very much because of that transfer. She took away some of his duties to allow him to do better with his cases, and as Mr. Cooper stated, he closed most of his cases, many of his cases. The last seven prior to his termination he closed, and although that's not all of his job, that is a primary part of his job is to close cases. They are given a caseload, and they are told that they need to resolve these cases. That is part of his job. It's a major part of his job is to close cases. In the conference call that was referred to earlier, Mr. Simmons told Mr. Equiquere that he did not believe that he had closed these cases, and those kinds of comments to Mr. Equiquere caused this crying outburst, which is a direct result of his disability, his depression, his panic disorder. And, yes, it was loud, and, yes, it did concern other employees. And his termination was partly based on this outburst that they called unprofessional conduct. He was not a danger to himself. He was not a danger to anybody else. However, part of the reason he was fired was because of this outburst, which was a direct result of his disability. And, finally, as far as the hostile work environment claim is concerned, there was the one statement made by a coworker about Mr. Equiquere going to Al-Qaeda camps in Nigeria when he was getting ready to go on vacation, which was offensive to Mr. Equiquere and would be offensive probably to anybody else. But as far as other people not being involved in the other types of harassment, Ken Shaw was the main perpetrator of the harassment that Mr. Equiquere was subjected to and helped create that hostile work environment, of which a tangible employment action was the failure to promote Mr. Equiquere when it came time to. Mr. Equiquere requested this Court. Your time has expired now, Mr. Petard. Thank you.  The Court will take a brief vote.